Good morning, ladies and gentlemen. You may proceed. Thank you, your honor. This matter comes before the court on... Would you please introduce yourself for the record, please? Yes, your honor. For the record, my name is Christopher Daly. I'm the attorney for the and I'm a CJA panel member from Missoula, Montana. Thank you, Mr. Daly. Your honor, this matter comes before the court on Mr. Lytle's appeal of his conviction in the United States District Court for the District of Montana. In the appellate brief that we filed, there are two issues that we have on appeal. The first issue involves the denial of the motion for mistrial, which was made at sidebar at the time of the trial. During the voir dire process, one of the panel members was questioned by the court and made it known that he was from Belgrade, Montana, and that he had very strong opinions about methamphetamine for the reason that his two adult children, who were then 19 and 22 years of age, had both been involved in methamphetamine. Mr. Daly, I understand that you're referring to juror number 12. Is that correct? That's correct, Mr. Smith. And juror number 12 was excused, was he not? He was, your honor. The court excused him for cause. All right. So the problem that we have to deal with is whether or not whatever he said in the voir dire would have affected the rest of the array. Isn't that correct? That is correct, your honor. Our claim is that the statements that he made were sufficiently inflammatory that it tainted the entire panel. And what we're seeking on appeal is to have a new trial based on that, given the fact that the court did not give either a cautionary instruction nor go back to the panel to actually ask further questions to see if there had been any taint. The court simply dismissed the juror for cause and then proceeded on. Did you ask Judge Malloy to ask some questions of the panel regarding this incident? No, I did not, your honor. Well, did you note some kind of objection that he didn't make further inquiry? No, my objection was only for the, uh, that he, that the panel was tainted and that, uh, uh, that was sufficient for a mistrial. All right. So, so I did not, I did not raise, I did not raise the issue at the time of him doing further. Well, tell me this. Do we, do we, uh, review that issue for plain error? Your honor, I believe it's being reviewed for abuse of discretion because the, uh, the case law that I cited in my brief, in the cases of Lucier and McKissick that I cited, uh, from other circuits show that, uh, uh, what really should have been done here was that the court should have, uh, taken the additional step to find out if there was a taint. If, if there wasn't, then, uh, there would be no question of a mistrial, but by keeping that issue open. That's what you didn't ask. I mean, you didn't ask for further inquiry. You asked for a mistrial. So it seems to me that after the mistrial question, you're, you're not on a plain error standard, but as to anything else the judge might have done, you probably are on a plain error standard. For his not doing the, um, cautionary instruction or the further board here. Right. Because you did ask for that. You did ask for a mistrial. That's correct, your honor. What about, I think you're relying on the Mack, the Mack case, or however one says it. And, um, that's correct, Mack v. Stewart. And there are obviously distinctions between that case and this one. Um, there you had somebody who was purporting to be an expert and purporting to make generic statements about credibility. On here, what was said was much more, um, uh, ambiguous. First of all, it wasn't, didn't purport to be expert, really. But second of all, um, the, um, there was general statements about that, that people made threats to his children, but not that either the witness or the defendant made, um, threats to his children. So where's the line, I guess, between Mack and, and, and, and the run of the cases in which people say things on veneer? Well, I think that's, that distinguishes it, for example, from the case of Thompson v. Borg that I mentioned in my brief as well, where a veneer person mentioned that he read something in the newspaper. I think in, in the present case, the, uh, testimony by the veneerman was much more dramatic in the sense that not only were his children threatened, but then he recognized on two occasions the name of as one of the government's chief witnesses. But that happens all the time in veneer. I mean, that's why the question's asked. I mean, the question is asked all the time. You know, have you ever heard of so and so? And people say, yes, I've heard of so and so. But they, they heard of him in the context of, uh, Mr. Smith's children being threatened as part of their, uh, use of methamphetamine in the Bozeman Belgrade area. So this is a very small community, and many of the, many of the other people on the jury were from the Bozeman Belgrade area. And so it, uh, had a very direct impact, I would think, on their way of thinking that this person who would be a government's main witness was, uh, possibly threatening the, the lives of one of their fellow citizens' children because they wore a wire. Well, wouldn't that, isn't that, uh, if you took that to be a fact, wouldn't that be a fact that it would be, uh, harmful to the government's case? It could potentially be harmful to the government's case as well, but it certainly was harmful, I think, to the defendant's case because the government's theory of the case was that Mr. Lytle was, uh, the, the manager, if you will, in the drug operation for Mr. Soriano in the Bozeman Belgrade area. And since it wasn't specific as to who did the actual, uh, who had done the actual threatening, other than this Mr. Soriano, the implication would be that it would be Mr. Soriano's alleged lieutenant, Mr. Lytle, who was the child. He didn't say it was Soriano. He didn't say it was Soriano who did the threatening. He just said he'd heard of Soriano and some connection with the drug dealing. He didn't say, he did not connect. I mean, it might have been different, but he, had he done so, but he did not direct Soriano to the threats.  He did not involve in it. He recognized the name. And then, like I say, later in that, later in the trial, Mr. Rodriguez Soriano testified as one of the government's chief witnesses against Mr. Lytle and testified that Mr. Lytle was his main, uh, uh, seller in the Bozeman Belgrade area. Was he questioned at all about, uh, you know, these threats? No, he was not, Your Honor. Because at that point, uh, I felt that it would be too detrimental to my client to bring that, uh, matter up again, so I, uh, elected not to explore that with Mr. Soriano, who, by the way, was a very difficult witness. He was supposedly there with an interpreter, but he spent half of his time speaking in English and half in Spanish. So it was a very, he was a very, uh, difficult witness, I think, for the government to control, let alone the defendant on cross. But that's, uh, the basis for, I believe, is that if the, if the court had gone back to the panel and asked if there was any taint, then we would know for sure whether or not Mr. Lytle got a fair trial. But we don't know that because the court failed to give either a caution or instruction or do any, uh, I believe this is sufficiently structural that it goes to the heart of Mr. Lytle's Sixth Amendment right to a fair trial. As the, uh, Eubanks case that I cited in my brief states that even if only one jury member is biased in some fashion, then the defendant is denied his constitutional right to a fair trial. Counsel, you're down to about a minute and a half. You can either use it or reserve it. Uh, if I may reserve that for the, uh, close of the government's argument. All right. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the court. My name is Tim Roscoe. I'm an assistant U.S. attorney here in Missoula, and I represent the United States in this appeal. I think Your Honors have, um, succinctly addressed with regards to the first issue what's really in play here, and that's the similarities, if there are any, between Mr. Lytle's case and the case of Mock versus Stewart. From the government's perspective, there are significant differences, particularly when the issue is viewed through the lens of whether the district court judge abused his discretion in denying the motion for a mistrial. The court in, uh, Mock versus Stewart Can I ask a question? stressed the fact that Yes, Your Honor. The, um, in your experience, what do, um, trial judges do to avoid this problem? Well, I mean, in this instance, um, he didn't say that Soriano had threatened his children, but he could have. I mean, that could have been the response, and it could have been the response, and that, it seems to me, might well have came to the jury. Are there mechanisms that trial judges use to avoid this problem? In other words, There are, Your Honor. I'm sorry. I apologize. I was speaking over you. Go ahead. Go ahead. Yes. There are, I think there are mechanisms from my limited experience, Your Honor. Excuse me. I think if this were really an issue in this case, Judge Molloy would have recognized that he's got over ten years of experience on the bench. I've seen him in similar circumstances, um, stop the individual, uh, person-by-person voir dire process and ask some global questions of the panel, um, to ask them to get a sense of how they feel about this issue. What is somewhat unique about the voir dire in this case is, first of all, that it was the second of the day this, the members of this panel had sat through a prior jury selection process in an unrelated case, and then were sitting for jury selection in this case. And I was personally astounded by the number of individuals who had personal experience with methamphetamine, either through family members or friends or neighbors. And the judge noted that during the sidebar discussion with counsel as well. It became to the point where, although Mr. Smith's comments were slightly out of the ordinary compared to what most of those panel members were saying, they were really not that far afield from what the court and the other jurors were hearing during the course of the day, and I think that's why there wasn't a lot of reaction to Mr. Smith's comments. I think one thing that's important to note is the very next juror who was heard from, juror number 11, was asked, do you have any concerns about any of the issues we've been discussing today? And said, no, no concerns. I've sat through both  in my mind that need to be addressed. With Mr. Smith's comments right then, currently in that individual's mind, you'd think that would be the individual who would have a concern and want to talk further about Storiano or Lytle or some of these issues involving methamphetamine, and that person did not want to engage in that conversation, did not seem to be concerned by Mr. Smith's comments. And as we note at page 11 in our brief, there are several additional jurors who are heard from after Mr. Smith, who have no problem following the law, assert that they will have no difficulty in being fair to both sides. And I think one other key distinction in this case is Mr. Smith, although he recognized the name Storiano, as Your Honors have recognized and acknowledged, didn't link him to the threats and also didn't recognize Mr. Lytle's name. And it stands to reason if he knew a lot about the threats that may have been tendered against his children, he would have known who did it and did not recognize the defendant's name in this case. But I think the key distinction is the difference between the nature of the statements being expert-like in the Stewart case and being just of a personal nature from a concerned parent in this case. Anything further, Counselor? Your Honors, I'm happy to address the... not unless Your Honors want me to address the chain of custody issue. I don't... I don't think that will be necessary, Counsel. Thank you. We'll see... I'll give you my time. Thank you. We will hear from Mr. Daly. You have... Mr. Daly, you have something to say. Thank you very much, Your Honors. Yes, and I would like to just kind of follow up on what Mr. Roscoe was saying about the court and the way the veneer selection went that day. We were doing the second veneer that day and it was late in the afternoon and the courthouse had plumbing problems, that's why we did the second day of the trial up in Helena and so I think that that may have contributed to the court's inattention in not dealing with the possible follow-up that should have been done in terms of asking the panel more questions based on my motion for a mistrial. I think that it was late in the afternoon, probably 4 or 4.30 when I made my sidebar comment. It had been a long day for everyone and I think that may have factored in because I think the Judge Molloy or other judges that I've practiced in front of over the years in the Federal Courts of Montana would have probably taken that issue more seriously had they not been as rushed as the cases were by that time in the afternoon. So I think that may have contributed to the court's inattention and possible abuse of discretion by not following up as I believe the court should have. And so I do think that also to talk about the distinction with the other jurors who were followed afterwards, the court was addressing them individually about their own concerns with methamphetamine issues in Montana, which Montana has had a virtual epidemic of meth over the last few years. Thank you, Counsel. Counsel, your time has expired. Thank you very much. The case just argued will be submitted for decision.
judges: O'scannlain, Tashima, Berzon